James McGUIRE, as President, and Joseph Diovisalvo, as Secretary-Treasurer of Coal, Gasoline, Fuel Oil Teamsters, Chauffeurs, Oil Burner Installation Maintenance, Servicemen and Helpers of New York City and Vicinity, Nassau and Suffolk Counties, New York, N. Y. Local Union No. 553, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Plaintiffs-Appellees,

v.

HUMBLE OIL & REFINING COMPANY, Defendant-Appellant.

No. 205, Docket 30113.

United States Court of Appeals Second Circuit.

Argued Nov. 19, 1965.

Decided Jan. 31, 1966.

Samuel J. Cohen, New York City (Bruce H. Simon, Stanley M. Berman, and Cohen & Weiss, New York City, on the brief), for plaintiffs-appellees.

John H. Morse, New York City (Harry H. Voigt, Melvyn Freeman, and Cravath, Swaine & Moore, New York City, on the brief), for defendant-appellant.

Before MEDINA, WATERMAN and HAYS, Circuit Judges.

MEDINA, Circuit Judge:

This case involves an appraisal of the extent to which the principles of John Wiley & Sons, Inc. v. Livingston, 1964, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 are applicable where, instead of a merger, there has been a purchase of part of the business of another concern, and where there is another union representing the employees of the purchasing corporation. Judge Tenney in the Southern District of New York (247 F.Supp. 113) has held the terms of collective bargaining agreements requiring arbitration of disputes between Local 553 and Weber & Quinn, the seller, binding on Humble Oil & Refining Company, the purchaser. Humble appeals from the judgment requiring it to submit to arbitration. We reverse.

While the contentions of the parties cover a wide range, we think it necessary to discuss only two aspects of the case. First, as this is a purchase of part of a business and not a merger, are the circumstances such as to indicate that "the lack of any substantial continuity of identity in the business enterprise before and after a [the] change would make a duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved?" John Wiley & Sons, Inc. v. Livingston, supra, 376 U.S. at p. 551, 84 S.Ct. at p. 915. See also Piano & Musical Instrument Workers Union, v. W. W. Kimball Co., 1964, 379 U.S. 357, 85 S.Ct. 441, 13 L.Ed.2d 541, reversing Per Curiam 333 F.2d 761 (7 Cir. 1964).

We agree with the recent holdings by the Third and Ninth Circuits that the mere fact that we are here dealing with a purchase and sale rather than a merger does not of itself make the principles of Wiley inapplicable. Wackenhut Corp. v. International Union, United Plant Guard Workers, 1964, 9 Cir., 332 F.2d 954; United Steelworkers of America v. Reliance Univ., Inc., 3 Cir., 1964, 335 F.2d 891. Indeed, Mr. Justice Harlan's opinion in Wiley states in so many words that the duty to arbitrate cannot be automatically removed by "a change in the corporate structure or ownership of a business enterprise" (376 U.S. at p. 549, 84 S.Ct. at p. 914). (Emphasis supplied.) Nor would it seem to be decisive that the transfer was of something less than the business as a whole or of all the assets of the seller. Here, however, the precise terms of the contract of purchase and sale are not before us. Only 13 of the former employees of Weber & Quinn were integrated into the group of 260 truck drivers and 95 mechanics employed by Humble. There are other factors. For example, Local 553 might have sought protection of the rights of the former Weber & Quinn employees by prosecuting arbitration proceedings against Weber & Quinn which the proofs disclose as still in existence and functioning.

In any event, as we have decided the case on the second point, namely the theory that the presence of another union at Humble, Industrial Employees Association, Inc., and the decision of the National Labor Relations Board, to which reference will be made below, make the enforcement of the arbitration clauses as against Humble unpractical and inequitable, we do not decide whether, if there was no union representing all the employees of Humble, including those previously in the employ of Weber & Quinn, the decision to compel arbitration could be sustained. We think it better to avoid crossing that bridge until it is necessary to do so.

As we find the union features of the case dispositive of the issues, we shall now discuss the facts in some detail.

## I.

Prior to the transaction of purchase and sale on August 7, 1964, Weber & Quinn owned and operated a retail coal and fuel oil business at 73 Ninth Street, Brooklyn, N. Y. Burdi Fuel Co., Inc. had a similar business at 242 Central Avenue in Brooklyn. The partnership of Weber & Quinn bought out Burdi and the corporation was dissolved, but Weber & Quinn continued to use the Burdi name. There were in effect four collective bargaining agreements with the union, Coal, Gasoline, Fuel Oil Teamsters, Chauffeurs, Oil Burner Installation, Maintenance, Servicemen and Helpers of New York City and Vicinity, Nassau and Suffolk Counties, New York, N. Y., Local Union 553, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; i. e. one agreement for drivers and one agreement for servicemen with Weber & Quinn and with Burdi. We may disregard the separate agreement with Burdi as the terms of the agreements were identical. The agreement with Weber & Quinn expired on December 15, 1965. It established Local 553 as the exclusive bargaining agent of the employees of Weber & Quinn and contained numerous provisions relative to seniority, the processing of grievances, pension and welfare rights, job security and other matters. Weber & Quinn, including Burdi, employed 10 drivers and 14 mechanics.

Humble, on the other hand, is a fully integrated oil company. In its New York Area, which includes Westchester, New York City and Long Island, Humble distributes substantial quantities of gasoline, fuel oil and other petroleum products to thousands of gasoline stations, commercial establishments and homes. Deliveries are made from bulk plants where large quantities of gasoline and fuel oil are kept in storage tanks. These distribution activities are carried on principally by motor truck salesmen, truck drivers, mechanics and bulk plant operators. Since 1937 these employees have been represented by the Association above referred to. The collective bargaining agreement between Humble and the Association at the time of the purchase and sale will continue in effect until April 30, 1966. The Association, while not certified, is made the exclusive bargaining agent for all the employees "with respect to rates of pay, wages, hours of work and other conditions of employment," and provision is made for the modification of the agreement prior to its date of expiration, upon 15 days notice by Humble or by the union. This collective bargaining agreement also contains numerous provisions affecting seniority, the processing of grievances and job security. In addition, provision is made for disability protection, retirement annuities and other welfare benefits. As of December 31, 1964 this agreement covered 518 employees. Of these 260 are truck drivers and 95 are mechanics in the New York Area.

The agreement of purchase and sale contained an express disclaimer by Humble of any obligations of Weber & Quinn to its employees, whether arising out of collective bargaining agreements or otherwise; and it contained no promise on the part of Humble to employ the former employees of Weber & Quinn. What Humble bought was "certain assets," including some trucks and equipment, but "principally" the Weber & Quinn fuel oil accounts in Brooklyn. Of the 10 Weber & Quinn drivers, 4 voluntarily entered the employ of Humble. Of the 14 Weber & Quinn mechanics, 9 voluntarily entered the employ of Humble. In his opinion denying the motion of Local 553 for a temporary injunction, Judge Sugarman found: "Certain other Weber-Quinn employees either refused an offer of employment from Humble or failed to pass Humble's regular physical examination and were not hired."

The process of integrating the former Weber & Quinn employees into the Humble organization had been planned in advance and was consummated immediately after the closing. The trucks were removed and repainted, and none of the employees formerly covered by the Local

553 agreements were kept on the premises of Weber & Quinn after August 7, 1964. Interim arrangements were made for receiving orders over the telephone, and receipts for deliveries bearing the names of Weber & Quinn and Burdi were used for a time, solely for certain accounting purposes connected with the terms of the sale.

Local 553 promptly demanded arbitration. As the arbitration clause [1] of the Local 553 agreements provided for arbitration by a designee of the New York State Board of Mediation, the items claimed to be the subject of arbitration are set forth in a letter of September 10, 1964 to the Board from counsel for Local 553. The judgment appealed from directs the parties to proceed to arbitration "of the disputes noticed for arbitration before the New York State Board of Mediation on September 10, 1964," and we have set forth in the margin the letter of September 10, 1964, in which 26 items of dispute are enumerated.[2]

---

1. ARBITRATION

SECTION 15: Should any difference or dispute arise during the life of this agreement regarding the meaning, interpretation, or application of any of the provisions of this agreement, or regarding any other grievance which may arise between the parties, which cannot be adjusted by the representatives of Local 553, I. B. of T., and the concerned Employer and/or the concerned Employer association, the same is to be submitted to arbitration. Either party to the dispute may place the disputed issue in arbitration by request for arbitration in writing served upon the other party and upon the New York State Mediation Board within ten (10) days from the last date of attempted negotiated settlement between the parties. The New York State Mediation Board shall appoint one of its staff mediators as the Arbitrator and shall arrange for arbitration of the matter in dispute.

2. September 10, 1964
New York State Board of Mediation
270 Broadway
New York, N. Y.
 Re: Local 553 and Weber & Quinn
 Gentlemen:

This office represents Local Union No. 553 affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Disputes have arisen between the Union on the one hand and Humble Oil Co. and Humble Oil and Refining Co., on the other, over the failure of these companies to recognize their obligations under the Union's Fuel Oil Contract 1964–1965 and Servicemen's, Installation Men's, Installation Men's Helpers, and Servicemen Trainees' Contract 1964–1965. Section 15 of both of the above contracts provides that any disputes shall be referred to a staff arbitrator to be appointed by the New York State Mediation Board. Accordingly, would you please appoint an arbitrator to hold a hearing regarding the following disputes and advise this office and the companies of the hearing date.

The employees whose rights are affected by the companies' refusal to recognize their obligations under the above contracts are presently being denied numerous benefits to which they are entitled. Such denial constitutes a substantial hardship, and it is therefore requested that an early hearing date be selected. Note that the Fuel Oil Contract provides that the arbitrator shall hear the dispute within five days from the date of referral to the Board unless otherwise agreed by the parties.

The companies have refused to recognize any of their obligations under the collective bargaining agreements. This refusal includes, but is not limited to the following:

1. Refusal to recognize Local 553 as the exclusive bargaining agent for employees formerly employed by Weber & Quinn and by Burdi Fuel Co., Inc.

2. Refusal to pay the wages provided in the contracts.

3. Refusal to observe the hours of work provisions of the contracts.

4. Refusal to observe the procedures for payment of wages provided in the contracts.

5. Refusal to allocate work assignments in a manner consistent with the seniority provisions of the contracts.

6. Refusal to observe the shift schedules provided in the contracts.

7. Refusal to observe the contractual procedure for replacing employees on the seniority list.

8. Refusal to pay the wages provided in the contracts for Sunday work and overtime work.

9. Refusal to require employees covered by the contracts to become and remain members of Local No. 553 on

Humble's refusal to arbitrate was followed on December 23, 1964 by the commencement of this action to compel Humble to submit to arbitration, pursuant to Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C., Section 185. On January 20, 1965 Humble filed with the National Labor Relations Board a petition for clarification "of the appropriate bargaining unit represented by the Association, so as to make clear that such unit includes the former employees of Weber." On July 11, 1965 the Board granted Humble's petition and ruled that the former Weber & Quinn employees being "effectively merged * * * into the New York unit currently represented by Industrial [the Association] * * * cannot now be considered a separate appropriate unit." Humble Oil & Refining Co., 1965, 153 N.L.R.B. No. 111. Although expressly disavowing any view on the question of Humble's contractual obligations to Local 553, the Board held that the Association is now the exclusive bargaining representative of the former Weber & Quinn employees.

## II.

It is elementary in these arbitration cases that *in limine* the court shall decide whether there is a duty to arbitrate. That is precisely the question before us. The only differentiating feature is that, instead of interpreting the language used in a particular arbitration clause of a written contract, we are now fashioning a feature of federal labor law in the context of the policy to be deduced from an integration of the various relevant Acts of the Congress and the decisions

and after 30 calendar days following the beginning of employment.

10. Refusal to maintain trucks and equipment operated by employees covered by the contracts in proper condition as required by the contracts.

11. Refusal to follow the contractual procedures for filling vacancies in jobs covered by the contracts.

12. Refusal to observe the contractual procedures for the hiring of trucks and other equipment.

13. Refusal to require all work within the categories covered by the contracts to be performed by employees working under and in compliance with the contracts.

14. Refusal to observe the sub-contracting provisions of the contracts.

15. Refusal to recognize the right of Union representatives to visit the Companies' premises.

16. Refusal to recognize the rights of employees to refuse to cross picket lines.

17. Refusal to provide the holidays set forth in the contracts and to pay the wages required for holiday work.

18. Refusal to grant vacations in accordance with the provisions of the contracts.

19. Refusal to recognize the rights of employees relating to workmens compensation insurance, personal injuries insurance, and public liability insurance.

20. Refusal to provide the payments required by the contracts during an employee's absence from work due to appearances in court.

21. Refusal to make the payments required by the contracts during an employee's absence from work pursuant to traffic violations summonses.

22. Refusal to provide the insurance and welfare benefits set forth in the contracts, including group life insurance; accidental death and dismemberment insurance, occupational and non-occupational; weekly benefits for non-occupational accident or sickness not covered by workmens compensation; the Limited Medical Expense Policy; surgical-medical insurance; dental benefits; payments under the Union Optical Plan; Associated Hospital Service coverage; contributions to the Local 553 Hospitalization Trust Fund; and other insurance and welfare benefits set forth in the contracts.

23. Refusal to recognize their personal liability for failure to provide the above insurance and welfare benefits.

24. Refusal to make payments to the Local 553 Pension Fund.

25. Refusal to recognize the authority of the Fuel Industry Union and Management Committee to settle certain disputes as provided in the contracts.

26. Refusal to compensate employees for use of their own cars and for loss of tools as provided in the Servicemen's, Installation Men's, Installation Men's Helpers, and Servicemen Trainees' Contract 1964-1965.

Very truly yours,
COHEN AND WEISS

of the courts in the field of labor law. Just as *Wiley* broke new ground and did so in the light of the existing body of federal law on the subject, so must we now put the strands of this case together and arrive at a reasoned conclusion consistent with the spirit and tenor of the principles already developed. In the light of *Wiley* we do not see how we can arrive at any other conclusion than that to direct arbitration here would disturb the harmony of the existing body of federal labor law and tend to foster rather than prevent industrial strife and unrest.

It is the failure of the court below to realize that all the facts, including the union features of the case, are to be taken into consideration in deciding the primary and controlling question of whether or not there is an obligation or "agreement" to arbitrate binding on Humble that led to the judgment that we are constrained to reverse.

We begin with footnote 5 at page 551 of 376 U.S., at page 915 of 84 S.Ct., in *Wiley*:

> "The fact that the Union does not represent a majority of an appropriate bargaining unit in Wiley does not prevent it from representing those employees who are covered by the agreement which is in dispute and out of which Wiley's duty to arbitrate arises. Retail Clerks Int'l Assn., Local Unions Nos. 128 & 633 v. Lion Dry Goods, Inc., 369 U.S. 17 [82 S.Ct. 541, 7 L.Ed.2d 503]. There is no problem of conflict with another union, cf. L. B. Spear & Co., 106 N.L.R.B. 687, since Wiley had no contract with any union covering the unit of employees which received the former Interscience employees."

In this case we not only have another union representing the Humble employees; we also have the decision of the Labor Board in the clarification proceeding establishing the fact that the Humble union, the Association, is the exclusive bargaining representative of all the present Humble employees, including those formerly employed by Weber & Quinn. This order of the Labor Board has not been challenged in the courts, and so it has become final and binding on all concerned. Moreover, it would seem not necessary to do more than to mention in passing that the order of the Labor Board in the clarification proceeding was made in the exercise of its primary and exclusive jurisdiction.

The consequences that flow from the Association's exclusive bargaining representation of all the Humble employees are decisive of the case.

### A.

If the judgment below should be affirmed and the arbitration proceedings commence, there would be an obvious conflict between the interests of the Humble employees as a whole and the interests of the 13 Humble employees who formerly worked for Weber & Quinn. If it be assumed that in the arbitration proceeding Local 553 would continue to represent the former employees of Weber & Quinn, it is not unlikely that they would press for an award giving these employees preferential treatment in the matter of seniority, job security, working conditions and other benefits that would adversely affect the other Humble employees. The result might well be unrest and dissatisfaction among the vast majority of workers in the plant. Such a burdening of the collective bargaining relationship is clearly to be avoided, as a matter of national labor policy. The combination of the two unions, one representing all the employees and the other representing a minority, is on its face an anomaly. Indeed, a mere glance at the 26 enumerated items of dispute proposed for arbitration will show that perhaps the principal purpose behind this action is to preserve the status of Local 553 as at least in some respects the bargaining representative of the former Weber & Quinn employees.

It is no answer to say, as does Local 553, that the Association's collective bargaining agreement will not expire until April 30, 1966 and that there will be nothing for the Association to bargain about with Humble until that agreement

is about to terminate. The bargaining process is a continuing affair. The agreement of the Association itself provides for modification during the term of the agreement on 15 days notice by either side. The processing of grievances is also an integral part of the entire scheme of the collective bargaining. The arbitration of the 26 disputes demanded by Local 553 could be a source of endless exacerbation and conflict for all concerned.

## B.

 But, in view of the decision of the Labor Board in the clarification proceeding, it is not even clear that Local 553 would be entitled to represent the former employees of Weber & Quinn before the arbitrator. Thus an order to Humble to arbitrate might force Humble to commit an unfair labor practice by "bargaining" with a minority union when a majority union is in existence. See Modine Mfg. Co. v. Grand Lodge Int'l Ass'n of Machinists, 6 Cir., 1954, 216 F.2d 326; American Seating Co., 1953, 106 N.L.R.B. 250; cf. Glendale Mfg. Co. v. Local 520, 4 Cir., 1960, 283 F.2d 936, cert. denied, 1961, 366 U.S. 950, 81 S.Ct. 1902, 6 L.Ed.2d 1243; Hughes Tool Co. v. N. L. R. B., 5 Cir., 1945, 147 F.2d 69; Hotel Corp. of Puerto Rico, Inc., 1963, 144 N.L.R.B. 728. But cf. Douds v. Local 1250, 2 Cir., 1949, 173 F.2d 764. Compare Black-Clawson Co., etc. v. International Ass'n of Machinists Lodge 355, 2 Cir., 1962, 313 F.2d 179; Plasti-Line, Inc. v. N. L. R. B., 6 Cir., 1960, 278 F.2d 482.

Arbitration of grievances is clearly a part of the collective bargaining process as defined in Section 8(d) of the National Labor Relations Act:

> "[T]o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to * * * the negotiation of an agreement, or *any question arising thereunder.* * * * *" 29 U.S.C., Section 158(d) (emphasis added).

Indeed, in the course of its discussion of the favored place arbitration occupies in our national labor policy, the Supreme Court has recognized that "arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself." United Steelworkers of America v. Warrior & Gulf Navig. Co., 1960, 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409. See also Ostrofsky v. United Steelworkers, D.C.Md., 1959, 171 F.Supp. 782, 790, aff'd, 4 Cir., 1960, 273 F.2d 614, cert. denied, 363 U.S. 849, 80 S.Ct. 1628, 4 L.Ed.2d 1732.

A duty of the employer under the Act is to bargain with the collective bargaining representative of a majority of the employees in the unit. 29 U.S.C., Section 158(a) (5). Such representative, moreover, has the right to be bargained with exclusively; the duty to bargain with the employees' agent under Section 8(a) (5) imposes "the negative duty to treat with no other." N. L. R. B. v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 44, 57 S.Ct. 615, 628, 81 L.Ed. 893; 29 U.S.C., Section 159(a); see Modine Mfg. Co. v. Grand Lodge Int'l Ass'n of Machinists, supra, 216 F.2d 326; cf. American Seating Co., supra, 106 N.L.R.B. 250; Admin. Ruling of N. L. R. B. General Counsel, Case No. F-1132, 1959, 44 L.L.R.M. 1338. And this duty to bargain applies whether the collective-bargaining representative is certified or not. See 29 U.S.C., Sections 158(a) (5), 159(a); Irving Air Chute Co. v. N. L. R. B., 2 Cir., 1965, 350 F.2d 176.

### CONCLUSION

Thus we conclude that, because of the union features of this case, there is no implied or constructive duty or agreement on the part of Humble to arbitrate with Local 553 any of the 26 items in controversy. The complaint is dismissed.

We express no opinion relative to the rights of Local 553 against Weber & Quinn.

Reversed.