USCP–WESCO, INC., et al., Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

United Food and Commercial Workers Union, et al., Intervenors.

Nos. 86–7434, 86–7463, 86–7464 and 86–7470.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 6, 1987.

Decided Sept. 8, 1987.

James Bowles, Stanley E. Tobin, George A. Pappy, and Timothy F. Ryan, Los Angeles, Cal., for petitioners.

John Burgoyne, Washington, D.C., for respondent.

Laurence D. Steinsapir, Henry M. Willis, and Jeffrey S. Wohlner, Los Angeles, Cal., for intervenors.

Before WALLACE, SCHROEDER and PREGERSON, Circuit Judges.

SCHROEDER, Circuit Judge:

The issue in this case is whether the National Labor Relations Board properly quashed notice of a hearing in a proceeding under section 10(k) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(k). That section provides for the resolution of jurisdictional disputes when it is charged that a union is attempting to force an employer to assign work to its members in violation of 8(b)(4)(D) of the NLRA, 29 U.S.C. § 158(b)(4)(D).[1] The Board found that under section 10(k) and section 8(b)(4)(D), this was not a jurisdictional dispute. Petitioners contend that we must reverse the NLRB ruling because of our decision in *Waterway Terminals Co. v. NLRB*, 467 F.2d 1011 (9th Cir.1972). We affirm.

## FACTS

Workers at Safeway's southern California grocery stores belong to the United Food and Commercial Workers Union ("UFCW"). Some Safeway workers are "general merchandise clerks," responsible for nonfood merchandise. From about 1964 until 1983, when nonfood items were delivered to the Safeway stores from Safeway's variety warehouse, they were checked, separated, priced, and shelved by the general merchandise clerks. These clerks would also dust, rotate, and arrange the shelved merchandise and order additional goods as needed.

For this period of approximately twenty years, virtually without exception, only Safeway employees, represented by the UFCW, were responsible for performing these tasks under collective bargaining agreements with the UFCW. The agreements contained a work preservation subcontracting clause which provided: "All work or services not specifically excluded by this Agreement is hereby recognized as bargaining unit work. Such bargaining unit work shall not be subcontracted, except as provided herein." The collective bargaining agreement also contained a broad arbitration provision: "Any and all matters of controversy, dispute or disagreement of any kind or character existing between the parties and arising out of or in any way involving the terms of this Agreement ... shall be settled and resolved" through grievance and arbitration procedures.

1. The statute states:
   It shall be an unfair labor practice for a labor organization or its agents—
   . . . .
   (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
   . . . .
   (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provision of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
   . . . .
   (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work. . . .

In March 1983, Safeway subcontracted to Wesco the job of handling, stocking, and ordering certain general merchandise items. Wesco employees were represented by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers ("Teamsters"). The contract between Safeway and Wesco required Wesco to supply and service a full line of nonfood products in 210 Safeway stores in southern California.

The UFCW then filed grievances alleging that Safeway violated the collective bargaining agreement by subcontracting to Wesco the servicing of nonfood items. Two arbitrators ruled that this was indeed a breach of the collective bargaining agreement between Safeway and the UFCW.

In March 1985, the Teamsters sent letters to Safeway and Wesco threatening to picket if the disputed work was assigned to anyone other than Wesco employees. The letters stated that " [t]he sole object of such picketing would be to force and require [Safeway and Wesco] to assign the said work to employees of USCP–Wesco, Inc. represented by [Teamsters' Local 578]." In April 1985, Wesco and the Food Employers Council, an association representing grocery employers in collective bargaining, filed charges with the NLRB alleging that the Teamsters had violated section 8(b)(4)(D) by making this demand. The Board conducted a seven-day hearing.

On June 24, 1986, the Board issued its decision and order quashing notice of hearing. The Board concluded that the evidence did not "establish a traditional jurisdictional dispute between two groups of employees cognizable under section 10(k) of the Act." Rather, it viewed the underlying controversy to be a work preservation dispute between Safeway and the UFCW, not a jurisdictional dispute between employees represented by the UFCW and the Teamsters.

In this circuit, an NLRB order quashing notice of a hearing in a section 10(k) proceeding is a final appealable order. *Foley-Wismer & Becker v. NLRB*, 682 F.2d 770, 771 (9th Cir.1982) (en banc); *Waterway*

*Terminals Co. v. NLRB*, 467 F.2d at 1014–17. Wesco, Safeway, and the Teamsters seek review in this court.

## DISCUSSION

Section 8(b)(4)(D) of the NLRA makes it an unfair labor practice for a labor organization to threaten, coerce, or restrain any person engaged in commerce with the object of forcing or requiring any employer to assign particular work to employees belonging to one labor organization rather than employees belonging to another labor organization.[2] Section 10(k) of the same Act states that whenever it is charged that a violation of section 8(b)(4)(D) has occurred, "the Board is empowered and directed to hear and determine the dispute."

■ The Board's findings of fact will be upheld if supported by substantial evidence and its conclusions of law as to jurisdiction will be upheld unless arbitrary and capricious. *Foley-Wismer & Becker v. NLRB*, 695 F.2d 424, 427 (9th Cir.1982).

■ The courts give considerable deference to NLRB expertise in matters of statutory interpretation. "If the Board's construction of the statute is 'reasonably defensible,' it should not be rejected merely because the courts might prefer another view of the statute." *IATSE v. NLRB*, 779 F.2d 552, 555 (9th Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986). Such deference is not appropriate, however, where "the Board has ignored a controlling legal standard." *NLRB v. HMO International/California Medical Group Health Plan, Inc.*, 678 F.2d 806, 809 (9th Cir.1982).

■ The traditional jurisdictional dispute involves a situation in which two unions or groups of employees "have collective bargaining agreements with one employer and each claims the work for its members through activities proscribed by section 8(b)(4)." 2 *The Developing Labor Law* 1249 (C. Morris ed. 2d ed. 1983). The essence is "a dispute between two or more groups of employees over which is entitled

**2.** *See* n. 1 *supra.*

to do the work for an employer." *NLRB v. Radio and Television Broadcast Engineers Union (CBS)*, 364 U.S. 573, 579, 81 S.Ct. 330, 334, 5 L.Ed.2d 302 (1961). The Board has said that the interaction of sections 8(b)(4)(D) and 10(k) is an effort to protect employers trapped between two competing unions, not a provision intended "to authorize the Board to arbitrate disputes between an employer and a union." *Metropolitan Printing*, 209 NLRB 320, 322 n. 6 (1974).

The present case has none of the hallmarks of a jurisdictional dispute over an employer's assignment of work. Rather, it appears to be a case in which employees of a different employer are endeavoring to force a company to do business with their employer. As the Board said in its decision:

> If the Board applies the 10(k) criteria to disputes such as this one, the Board would become the arbiter of almost every subcontracting dispute. Finding a jurisdictional dispute every time an employer allegedly breaches a no-subcontracting clause would not promote the private settlement of such disputes through the collective-bargaining process. To hold that this dispute is a jurisdictional dispute to be decided by the Board would not allow the UFCW employees the benefit of their negotiated work preservation clause. The clause would be unenforceable, and Safeway would be permitted to ignore its collective-bargaining obligation. Furthermore, Teamsters and Wesco would be rewarded for their willingness to use economic force, potentially to obtain work to which they may not be entitled because of the no-subcontracting clause in the Safeway-UFCW agreement.

The petitioners argue, however, that the case is controlled by *Waterway Terminals Co. v. NLRB*. If *Waterway* is apposite, this court must reverse the Board's decision. A detailed exposition of the situation in *Waterway* is therefore useful.

Waterway was a "freight interchanger," responsible for unloading freight from barges and reloading it onto trucks or railcars. Before 1968, subcontractors performed the loading and unloading functions with different unions. Western Transportation Co. did the unloading with members of the Inlandboatmen's Union ("IBU"). Interstate Carloading Co. did the loading with employees represented by the International Longshoremen's and Warehousemen's Union ("ILWU"). Then, in 1968, Waterway became Western's corporate successor and reaffirmed that Waterway employees represented by the IBU would continue barge unloading operations.

In 1969, Interstate asked for a loading rate increase, and Waterway decided to perform loading operations with its own employees, terminating the subcontract with Interstate. When Waterway made clear its intent to have its own IBU employees do the work, the ILWU notified Waterway that it believed that Waterway should bargain with it for the work, threatening that it would picket.

After hearings pursuant to section 10(k) on Waterway's and the IBU's complaint of jurisdictional picketing, the Board concluded that the ILWU's object in striking was to obtain reinstatement of its own members in the unloading by forcing the employer to recognize it as bargaining representative, and that, consequently, no jurisdictional dispute existed under section 10(k). The Board found the dispute to concern a representational, not jurisdictional, issue. The Board therefore quashed the previously issued notice of a 10(k) hearing. *International Longshoremen's and Warehousemen's Union Local 8 (Waterway Terminals Co.)*, 185 NLRB 186 (1970), *vacated and remanded*, 467 F.2d 1011 (9th Cir. 1972).

Reversing the Board, this court noted that the dispute involved two discrete groups (the IBU and the ILWU), each insisting upon its sole right to perform the loading duties. 467 F.2d at 1018. The court said: "While the situation contains elements of representation, it does not exemplify the classic representation dispute where each of two vying unions insists that it represents the majority of the employees of a given employer." *Id.* We emphasized

that in determining whether a dispute was representational or jurisdictional, recourse was to be made to the language of the statute:

The difficulties involved in the semantics of a characterization of the dispute as "representational" or "jurisdictional" are somewhat clarified by measuring the fact situation against the language of the statute to determine whether a labor organization is "(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization ... rather than to employees in another labor organization...."

*Id.* at 1019.

We are here faced with a superficially similar situation in that there has been a threat of picketing by employees of a union representing a subcontractor's employees in order to obtain work for its members. This case differs fundamentally from *Waterway*, however, in that in *Waterway* the real dispute was precipitated by the cancellation of a subcontract and the employer's assignment of work to its own employees. In this case, the dispute was precipitated by the employer's entering into a subcontract in violation of its own collective bargaining agreement.

It is apparent, both from the decision of this court and from the Board's decisions in the *Waterway* case, that both unions were asserting a right to a collective bargaining relationship with the picketed employer. The issue in *Waterway* was therefore whether the dispute should be regarded as a jurisdictional dispute or a representational dispute. In this case, there has never been any suggestion that the dispute is over which union is to represent Safeway employees. Rather the dispute has arisen as a result of Safeway's subcontracting of work away from its employees to the employees of another contractor and disregarding the provisions of its own collective bargaining agreement with the UFCW. We therefore agree with the Board that this case is not controlled by *Waterway*.

Petitioners argue that the Board's decision below is inconsistent with the Board's previous decision in *Retail Clerk's Union*

*Local 770 (Food Employers Council)*, 125 NLRB 984 (1959) (involving the same unions, the same employer, and the same work nearly thirty years ago), in which the NLRB found that there was a jurisdictional dispute between the Teamsters and the UFCW and awarded work to the Teamsters in accordance with the employer's preference. That dispute, however, arose in the historical context of a multi-employer bargaining unit in which many of the employers had collective bargaining agreements with both unions. In addition, food market employees represented by the Retail Clerk's Union could not then point to a history of over two decades of handling non-food items pursuant to collective bargaining agreements. It was not a situation like the one before us, in which the employees of a subcontractor are endeavoring to force a company to do business with their employer.

Petitioners urge a broad construction of 8(b)(4)(D) which would require the Board to treat any picketing by a union to obtain work for its members as a jurisdictional dispute subject to 10(k) proceedings, even where the employer has been ordered through arbitration to comply with the terms of an existing bargaining agreement and has no bargaining relationship with the picketing union. This approach would subvert the Act's intent to encourage collective bargaining "to the end that an employment contract, binding on both parties, should be made." S.Rep. No. 105, 80th Cong., 1st Sess. 15 (1947), *quoted in Textile Workers Union v. Lincoln Mills of Alabama*, 353 U.S. 448, 453–54, 77 S.Ct. 912, 916, 1 L.Ed.2d 972 (1957). Sound labor policy has emphasized the importance of collective bargaining. *See, e.g., NLRB v. International Longshoremen's Association, AFL–CIO*, 473 U.S. 61, 84, 105 S.Ct. 3045, 3058, 87 L.Ed.2d 47 (1985) ("We have often noted that a basic premise of the labor laws is that 'collective discussions backed by the parties' economic weapons will result in decisions that are better for both management and labor and for society as a whole.'") (citation omitted); *United Steelworkers of America v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 578, 80 S.Ct.

1347, 1350, 4 L.Ed.2d 1409 (1960) ("The present federal policy is to promote industrial stabilization through the collective bargaining agreement.").

Similarly, the Act prefers arbitration as the desirable method of settlement of disputes over the application or interrelation of collective bargaining agreements. 29 U.S.C. § 173(d); *see also Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 377–78, 94 S.Ct. 629, 636–37, 38 L.Ed.2d 583 (1974) ("The federal policy favoring arbitration of labor disputes is firmly grounded in congressional command."); *United Steelworkers of America v. Warrior and Gulf,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409. Too readily compelling Board resolution of labor disputes corrodes the congressional policy decision to favor arbitration of these disputes. We see no reason to force the Board to adopt the interpretation of the NLRA that petitioners proffer.

Contrary to the petitioners' contention, Safeway is not without a remedy for disruption caused by picketing. Here, where the object is to force the employer to use employees represented by a union with which the employer has not contracted and to cease doing some business with another union, a charge can be filed under 8(b)(4)(B), which governs secondary picketing.[3] *See International Longshoremen's & Warehousemen's Union, Local 62–B v. NLRB,* 781 F.2d 919 (D.C.Cir.1986); Leslie, *The Role of the NLRB and the Courts in Resolving Union Jurisdictional Disputes,* 75 Colum.L.Rev. 1470, 1472–73 (1975).

AFFIRMED.